IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 1:20-CR-83(2) |
| | § | Judge Heartfield |
| MICHAEL MARTIN, | § | |
| a/k/a "ARYAN PRODIGY" | § | |
| a/k/a "AP" | § | |

## GOVERNMENT'S SENTENCING MEMORANDUM AS TO DEFENDANT MICHAEL MARTIN

Comes now, the United States of America, by and through the Acting United States Attorney for the Eastern District of Texas and the Chief of the Department of Justice's Organized Crime and Gang Section, and files this sentencing memorandum in support of its recommendation that this Court sentence the Defendant to a sentence at the top of his guidelines range.

## I.    INTRODUCTION

Defendant Michael Martin is an admitted leader of the Aryan Circle—a violent, race-based gang that originated in Texas and has spread to states around the country.  The gang operates through a militaristic chain of command, where lower ranking members are required to follow orders of higher ranking members, and where the way to move up within the gang is to put in work, or commit acts of violence.  Defendant Martin worked his way to the very top of that organization, serving for a period of time as the "Upper Board" member in charge of the "Texas Free World," meaning he had authority over all non-

1

incarcerated Aryan Circle members in the state.

The Defendant ordered and encouraged other Aryan Circle members to carry out numerous acts of violence, including the specific assault resulting in serious bodily injury to which he pled guilty and for which he is now being sentenced.  Some of the other criminal activity in which Defendant Martin willingly participated and directed as an Aryan Circle leader included, but is not limited to: (1) issuing a "green light" order, which is "an attack up to and including the murder of a rival gang member or of an AC member or associate who had committed an egregious violation of the gang's rules"; (2) aiding and abetting a murder by sanctioning the murder after it was carried out and agreeing that the AC member who committed it should receive Aryan Circle treasury funds and methamphetamine to sell while he was on the run from law enforcement; and (3) conspiring to distribute methamphetamine.

To be clear, this Court is only sentencing Defendant Martin on Count Two of the Indictment, Assault Resulting in Serious Bodily Injury in Aid of Racketeering.  But consistent with its duty to inform the Court of all factual information relevant to the offense, the United States intends to inform the Court at sentencing of its understanding of the scope of Defendant Martin's leadership and participation within the Aryan Circle.  Relevant facts as the government understands them include Defendant Martin's contention that he separated himself from the gang several years ago and has abided by the law since that time.  Assuming that is true and taking it into account (in addition to all of the Defendant's other criminal activity for which he has never been held accountable), the United States agrees with the United States Probation Office's recommendation and asks that this Court

2

sentence Defendant Martin to eighty-seven (87) months of imprisonment.

## II.      FACTS AND PROCEDURAL HISTORY

On October 7, 2020, a federal grand jury sitting in Beaumont, Texas, returned an indictment charging the Defendant, Michael Martin, a/k/a "Aryan Prodigy," a/k/a "AP," with one count of Assault Resulting in Serious Bodily Injury in Aid of Racketeering. *See* ECF No. 2 ("Indictment") at 18-19 (Count Two). The charged offense carries a statutory maximum penalty of twenty years of imprisonment. 18 U.S.C. § 1959(a)(3). The Indictment also named the Defendant in four of twenty-seven overt acts conducted in furtherance of a racketeering conspiracy, though the Defendant was not charged in that count. Those acts include that the Defendant (1) ordered a "green light," which the Indictment defines as "an attack up to and including the murder of a rival gang member or of an AC member or associate who had committed an egregious violation of the gang's rules"; (2) met with another AC member after that member had committed a murder, and at that meeting the Defendant both sanctioned the murder and agreed that the AC member should receive AC Treasury funds and methamphetamine to sell while he was on the run; (3) discussed his plan for organizing the distribution of methamphetamine with another AC member on a Title III wire intercept; and (4) engaged with other AC members in the conduct that makes up the substantive Count Two with which he was charged. *See* Indictment at ¶¶ 2(g), 7(OA-12), (OA-14), (OA-15), (OA-16).

On March 4, 2021, Defendant Martin pled guilty without a plea agreement before the Honorable United States Magistrate Judge Zack Hawthorn. In support of his guilty plea, the Defendant signed a Factual Basis and Stipulation. ECF No. 144 ("Factual Basis").

The Defendant admitted in that document that he was a member of the Aryan Circle from the early 2000s through at least October 2, 2016, which is the date of the relevant offense conduct.  *Id.* at 10-11.  He further admitted to holding the rank of Upper Board member, meaning that he was one of the Aryan Circle's five foremost leaders in the country.  *Id.*

The specific offense conduct that Defendant Martin admitted to in his Factual Basis is as follows: after learning that an Aryan Circle member wanted to leave the Aryan Circle to join a different gang, the Defendant "ordered AC members to attack [the victim] in order to 'x,' or remove him, from the gang, because it violated the AC's rules to join another organization." *Id.* at 11.  The Defendant attended a "church," or gang meeting, along with no fewer than five other AC members in order to plan "the logistics" of the beating including by "setting ground rules." *Id.*  Then, on October 2, 2016, Defendant Martin and other AC members met at a park near Tyler, Texas to carry out the removal, despite the victim's contact with AC members prior to the beating "begging that they not carry out" the attack. *Id.*  After arriving at the park, Defendant Martin "announced that the AC members had brought firearms." *Id.*

Two other AC members carried out the assault, striking the victim multiple times and kicking him while he was on the ground.  *Id.* at 12.  Members of the other gang ultimately stopped the assault.  *Id.*  After they did so, however, Defendant Martin "approached [the victim,] crouched down next to [the victim] on the ground, and told [the victim] that he could have been beaten worse and that 'we,' the AC, kill people." *Id.*  The victim received treatment at a hospital for his injuries and suffered continued "migraine headaches and blurred vision" for years after the assault.  *Id.*

The Defendant additionally admitted to a myriad of facts that are material to the Probation Department's calculation of the United States Sentencing Guidelines ("U.S.S.G.") applicable to his conviction.  Based on the Defendant's admissions in his Factual Basis and a review of evidence, the Probation Officer applied the following enhancements to the Defendant's offense conduct:

- A two-level enhancement because the offense involved "more than minimal planning," pursuant to U.S.S.G. § 2A2.2(b)(1);

- A three-level enhancement because "a dangerous weapon . . . was brandished or its use was threatened," pursuant to U.S.S.G. § 2A2.2(b)(2)(C);

- A five-level enhancement because the victim "sustained serious bodily injury," pursuant to U.S.S.G. § 2A2.2(b)(3(B); and

- A four-level enhancement because the Defendant was "an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive," pursuant to U.S.S.G. § 3B1.1(a).

PSR ¶¶ 36-38, 40.  With those enhancements added to the base offense level of 14, the Defendant's resulting offense level, after a three-point reduction for acceptance of responsibility, is 25.  *Id.* at ¶ 46.

The Defendant objected to the Probation Officer's application of the first two enhancements listed above.  ECF No. 200, Def's Obj.[1]  He cited no case law in support of those objections and overlooked several facts to which he admitted either in pleading guilty and signing his Factual Basis, or in a recorded interview with law enforcement that took

---

[1] Defendant Martin did not object to the fourth enhancement for his aggravating role as a leader of the offense, and has therefore waived any such objection.  He further amended his original objections, ECF No. 199, such that he no longer objects to the third enhancement relating to the degree of the victim's injury.  *See* Def's Obj. 6-10.

place prior to his indictment.  His arguments are further belied by the evidence the United States will introduce at sentencing.

### III.    GUIDELINES OBJECTIONS

The Probation Officer correctly calculated Defendant Martin's guidelines range and this Court should overrule each of his objections.  The appropriate guidelines range is, as stated by the U.S. Probation Officer, 70 to 87 months (offense level 25 and criminal history category III).  ECF No. 210, Presentence Investigation Report ("PSR"), ¶ 77.

### 1.    The Assault Involved More Than Minimal Planning.

The Defendant first objected to the Probation Officer's determination that "the assault involved more than minimal planning," pursuant to U.S.S.G. § 2A2.2(b)(1).  Def's Obj. at 1-2.  "More than minimal planning" does not require a sophisticated scheme, but simply means "more planning than is typical for commission of the offense in a simple form."  U.S.S.G. § 2A2.2(b)(1) cmt. n.2.  Examples of conduct demonstrating more than minimal planning include "luring the victim to a specific location or wearing a ski mask to prevent identification."  *Id.*

As Defendant Martin agreed by signing the Factual Basis, an Aryan Circle member and co-defendant specifically held a "church," or gang meeting, where no fewer than six Aryan Circle members gathered for the express purpose of planning the assault to vindicate the victim's violation of the Aryan Circle's rules by "patching over," or joining another gang.  Factual Basis at 11.  "The planning involved setting ground rules for how the assault would take place."  *Id.*  The group chose the location of a park near Tyler, Texas, and

Defendant Martin and at least five other Aryan Circle members met there, along with members of the rival gang, to carry out the assault.  *Id.*

Evidence in this case further demonstrates that the Defendant agreed to commit the assault as early as August of 2016, when he discussed it on a recorded jail call with another Aryan Circle leader.  As the Probation Officer accurately explained in her response to the Defendant's objection, "[t]he way the AC conducts its affairs includes assault against individuals who pose a threat to the enterprise, such as members who violated the gang's rule" against leaving the gang.  PSR Addendum at i.  Defendant Martin, as an Upper Board member, knew the rules and acted upon them as he deemed necessary—not in some spontaneous fashion, but through the AC procedures and chain of command.  *Id.*  The discussions that occurred beforehand, as well as the way it was conducted, is intrinsic to the gang's nature and encompassed far more than minimal planning.

The circumstances surrounding the assault itself are analogous to others in which courts have found defendants engaged in "more than minimal planning."  *See, e.g.*, *United States v. Montgomery*, 182 F. App'x 295, 296-97 (5th Cir. 2006) (holding enhancement was appropriately applied where defendant gang members in prison used weapons they made in attack and obtained permission from higher-ranking member to commit attack); *United States v. Coombs*, 823 F. App'x 613, 614-18 (10th Cir. 2020) (upholding enhancement where defendant waited in bathroom stall for woman to enter and use restroom, then wrapped his face with toilet paper before attacking her with bear repellent and punching her); *United States v. Simpson*, 760 F. App'x 931, 933-35 (11th Cir. 2019) (enhancement appropriate when defendants had "specific plan" in advance to "rob a

7

particular person who was there for a specific reason," in contrast to situation where defendant "took advantage of what he must have deemed a fortuitous opportunity"); *United States v. Tilghman*, 332 F. App'x 269, 273 (6th Cir. 2009) (upholding enhancement finding where, among other things, defendant had motive to plan assault, telegraphed his intent with threats, and where circumstances of assault "do[] not sound spontaneous").

Specifically, the Defendant's discussion of the plan months in advance, his order as a ranking member to others that the assault would take place, the fact that he and at least five other Aryan Circle members met and planned the "ground rules," their coordination of the assault with members of a rival gang in order to vindicate the victim's violation of the Aryan Circle's rules, and their enforcement of those rules at the site of the assault, demonstrate that the assault involved "more than minimal planning."  The Probation Officer therefore correctly applied the two-point enhancement and this Court should overrule the Defendant's objection.

### 2.  A dangerous weapon was brandished or its use was threatened.

The Defendant also objected to the PSR's application of a three-point enhancement because "a dangerous weapon (including a firearm) was brandished or its use was threatened," pursuant to U.S.S.G. § 2A2.2(b)(2)(C).  Def's Obj. 3-4.  The Probation Officer's rationale in applying the enhancement was two-fold:

> At the park where the assault occurred, Martin announced that the AC members brought firearms with them.  He also told the victim that "we, the AC, kill people."  These comments indicate a threat to use a dangerous weapon.  Furthermore, considering the manner in which the victim was kicked, the assailants used their feet as a dangerous weapon.

PSR ¶ 37.   Under either theory, the PSR correctly applied the "dangerous weapon" enhancement.

First, the Probation Officer was correct in concluding that a firearm "was brandished or its use was threatened."   U.S.S.G. § 2A2.2(b)(2)(C).   Section 1B1.1 explains in the commentary that "'[b]randished' with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, *or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person*."   U.S.S.G. § 1B1.1 cmt. n.1(C) (emphasis added).   Although a prior version of the Sentencing Guidelines defined "brandished" to require that "the weapon was pointed or waved about or displayed in a threatening manner," that standard was changed more than twenty years ago and now "can mean as little as displaying part of a firearm or making the presence of the firearm known in order to intimidate."   *United States v. Dunigan*, 555 F.3d 501, 505 (5th Cir. 2009).

As agreed in the Factual Basis, upon arriving at the park where the assault would take place, Defendant Martin "announced that the AC members had brought firearms." Factual Basis at 11.   Immediately after the assault and while the victim was still on the ground, Defendant Martin "crouched down next to [the victim] on the ground, and told [the victim] that . . . "'we,' the AC, 'kill people.'"   *Id.* at 12.   In addition, Defendant Martin gave a post-*Miranda* interview prior to his indictment in which he stated that "[a] few of the guys had weapons [at the scene]," specifying that "Thor had a pistol, Bobby had a pistol."   These facts, among others that the United States can present at sentencing, support

application of this enhancement because a firearm "was brandished or its use was threatened."  U.S.S.G. § 2A2.2(b)(2)(C).

Indeed, the Defendant's own post-*Miranda* statement directly contradicts his claim that "no weapon of any kind was . . . brandished" under the applicable definition. Moreover, if needed, the United States can produce additional statements given to law enforcement from others present for the assault who can further describe the Defendant's threatening conduct and the presence of firearms.

Second, the United States Probation Officer correctly concluded that the assailants' conduct constituted use of a "dangerous weapon."  PSR ¶ 37.  As with other enhancements, the Defendant's admission in his Factual Basis supports application of the enhancement on this ground.  Specifically, the Defendant admitted that his co-defendants "used their hands and feet to strike [the victim] multiple times," including by kicking him "multiple times while he was on the ground."  Factual Basis at 12.

The commentary states that "'[d]angerous weapon' has the meaning given that term in § 1B1.1, Application Note 1, and includes any instrument that is not ordinarily used as a weapon, (*e.g.*, a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent to commit bodily injury."  U.S.S.G. § 2A2.2 cmt. n.1.  Section 1B1.1, in turn, defines "dangerous weapon" to include:

> (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

10

U.S.S.G. § 1B1.1 cmt. n.1(E).  As other courts have observed, this definition is expansive and "allows a trier of fact to consider as a dangerous weapon a knife, gun, *shoe*, dog, rake, or any other item adapted to causing death or serious bodily injury."  *See, e.g.*, *United States v. Passaro*, 577 F.3d 207, 222 (4th Cir. 2009) (emphasis added) (remanding for determination of whether defendant actually used boot or flashlight as dangerous weapons, rather than merely threatened their use); *United States v. Dunnaway*, 88 F.3d 617, 619 (8th Cir. 1996) (holding boots and bottle constituted dangerous weapons); *United States v. Dayea*, 32 F.3d 1377, 1379 n.2 (9th Cir. 1994) ("[C]ourts have found that, in the proper circumstances, almost anything can count as a dangerous weapon, including walking sticks, leather straps, rakes, tennis shoes, rubber boots, dogs, rings, concrete curbs, clothes irons, and stink bombs.") (citing cases from other circuits and state law).  The defendants' use of their feet, especially while wearing shoes, may therefore appropriately qualify as dangerous weapons under the law.

This Court should also reject the Defendant's argument that this enhancement should not apply because "the beating was not carried out by" the Defendant and he personally "did not hit or punch or kick" the victim.  Def's Obj. at 4.  As the Sentencing Guidelines and the Fifth Circuit have made clear, "for purposes of determining the offense level, a defendant is accountable not only for his own acts but also for 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'"  *United States v. Fuentes-Jaimes*, 301 F. App'x 379, 382-83 (5th Cir. 2008) (quoting U.S.S.G. § 1B1.3(a)(1)(B)).  The Defendant ordered the assault to take place,

participated in planning it, and was present while his subordinates carried it out.  He is therefore legally responsible for his codefendants' actions.

Regardless of which theory this Court adopts, at least a three-level enhancement for brandishing a dangerous weapon or threatening its use (if not a four-level enhancement for actual use[2]) applies pursuant to U.S.S.G. § 2A2.2(b)(2).

## IV.    SECTION 3553(a) FACTORS

The application of the factors discussed above, along with others not disputed by the Defendant, results in a guidelines range of 70-87 months of imprisonment.  The Court is of course not bound to impose a sentence in this range, but must first consider the factors in 18 U.S.C. § 3553 in order to fashion a sentence that is "sufficient, but not greater than necessary," to effectuate the purposes laid out in the statute.

In this case, the guidelines range is entirely reasonable in light of the § 3553(a) factors.  More specifically, a high-end guidelines sentence is necessary to adequately reflect the seriousness of Defendant Martin's conduct and the harm he inflicted as a leader of the Aryan Circle.  The nature and circumstances of the offense, the history and characteristics of the Defendant, the need to promote respect for the law, to provide adequate deterrence, and the avoidance of unwarranted sentencing disparities, all counsel

---

[2] Indeed, if the Court agrees with the United States Probation Officer that feet/shoes can be dangerous weapons as used in this assault, then a four-level enhancement is applicable pursuant to U.S.S.G. § 2A2.2(b)(2)(B) because those feet/shoes were in fact "used," rather than merely "brandished" or "threatened," as provided in § 2A2.2(b)(2)(C).  *See Passaro*, 577 F.3d at 222 ("If the district court finds that a specific instrumentality constituted a dangerous weapon and that [the defendant] actually used that weapon, then the Guidelines direct that the court apply the four-level enhancement for actual use of a dangerous weapon.").

in favor of a sentence at the high end of the sentence recommended by the guidelines and the Probation Officer.

Although the United States believes that an above-guidelines sentence would be reasonable in this case, the government's recommendation takes into account the Defendant's claim that he has separated from the gang and has not engaged in additional criminal activity in the past several years.  The government's sentencing recommendation is therefore 87 months of imprisonment.

### 1.  Nature and Circumstances of the Offense

The United States will not belabor the facts of the specifically charged assault resulting in serious bodily injury further.  But it is important to recognize that those facts alone do not fully encompass the Defendant's role and activities within the Aryan Circle. Although the United States is not moving for an upward departure pursuant to U.S.S.G. § 5K2.21 for dismissed or uncharged conduct (which the PSR notes may be appropriate, ¶ 89), the government would be remiss if it did not further describe the nature of the enterprise which the Defendant led and attempt to describe for the Court how fully the Defendant devoted himself to that enterprise.  The United States will present evidence of that involvement to the Court at sentencing so that the Court may impose a sentence "upon a complete and accurate record."  *See United States v. Pizzolato*, 655 F.3d 403, 410 (5th Cir. 2011) ("[A] prosecutor has the duty as an officer of the court to inform the court of all factual information relevant to the defendant's sentence so that a sentence may be imposed upon a complete and accurate record.").  That evidence will include the testimony of a case agent, photographs of Defendant Martin, a report of a post-*Miranda* interview conducted

with the Defendant long before his arrest, reports of interviews with co-conspirators, and several recorded phone calls.

### 2.  Martin's History and Characteristics

As stated above, the United States's recommendation contemplates potentially mitigating factors pertaining to the Defendant's upbringing and mental and emotional health as described in the PSR.  It also takes into account his representation that he has not engaged in criminal activity with the gang for several years, that he was working prior to his arrest on this case, and that he has close relationships and a family.

Nevertheless, the Defendant's membership in the Aryan Circle constituted such an important part of his identity that he spent well over a decade working his way up within the gang until he was a leader at the very top echelon of that organization.  The Defendant's pride in his membership is demonstrated by the gang tattoos he still has on his body—the words "Aryan Prodigy" printed across his chest and the phrase "360 Aryan" on his shoulder.  It is worth noting that the Defendant does not seem to have made any effort to remove those tattoos since his apparent disassociation with the gang.

### 3.  Promote Respect for the Law

Gang members like those in the Aryan Circle operate in a world with its own sovereign regime.  They believe that the Constitution and codes of the gang outweigh the laws of the United States and that their actions—drug trafficking, violent assaults, and even acts involving murder—are beyond reproach when done with the purpose of furthering the criminal enterprise.  In short, they believe that the laws of this country do not apply to them.  Defendant Martin operated at the very top of the Aryan Circle's militaristic chain of

command.  The gang actively recruited members in states across the country both inside and outside of prison, and has continued spreading its doctrines past the period of the original indictment in this case.  Taking into account all other § 3553(a) factors, a sentence at the high end of his guidelines range, will adequately promote respect for the law both on the part of Defendant Martin, as well as other Aryan Circle members who did his bidding.

### 4.  Need for Deterrence

The need for deterrence in this case is unusually acute.  First, the harm caused to communities by gang violence is grave, vastly increasing the importance of preventing future victimization.  Second, the extent of premeditation and that this type of crime is encouraged by the rules of the organization, means that offenses like this one can be successfully deterred if those who engage in this conduct understand the risks and consequences of such behavior.

### 5.  Relative Culpability

Finally, the recommended sentence would appropriately reflect the relative culpability of the various defendants charged in this case and thereby avoid unwarranted sentencing disparities.  Several of the other defendants charged in this same count have higher guidelines ranges than the defendant solely because they have more extensive formal criminal histories than Defendant Martin.  The United States respectfully submits that where this Defendant held such an influential role within the gang, and engaged in such wide-ranging criminal conduct that went far above and beyond the conduct in the instant offense (and which relates to his history and characteristics and other 3553(a) factors), his culpability relative to other defendants charged with this same count is

substantially greater.  The sentence this Court imposes should reflect that reality despite the fact that Defendant Martin has fewer prior criminal convictions than some of his fellow Aryan Circle members.

On the flip side of this analysis, the United States recognizes that Defendant Martin's conduct, though extensive and contemptible, does not fully rival that of some Aryan Circle leaders who are still actively engaged in directing the affairs of the criminal enterprise.  Those defendants' guidelines calculations, and the recommendations of the United States when it comes time for their sentencings, will reflect what the government views as their substantially greater culpability than this Defendant, for whom an 87-month sentence is wholly reasonable.

## V.      CONCLUSION

For all of the reasons set forth above, the United States urges the Court to accept the United States Probation Office and the government's recommendation and to impose a sentence of 87 months of imprisonment.

Respectfully submitted,

NICHOLAS J. GANJEI
ACTING UNITED STATES ATTORNEY

DAVID L. JAFFE, CHIEF
ORGANIZED CRIME & GANG SECTION

*/s/ Christopher Rapp*
Christopher Rapp
Assistant United States Attorney

16

*/s/ Bethany Lipman*
Bethany Lipman
Trial Attorney

*/s/ Rebecca Dunnan*
Rebecca Dunnan
Trial Attorney

## **CERTIFICATE OF SERVICE**

I certify a true and correct copy of this motion was served on defense counsel by email and electronic filing (CM/ECF) on this 3rd day of October, 2021.

*/s/ Bethany Lipman*
Bethany Lipman